DONALDSON, Judge.
Auburn’s Gameday Center at Magnolia Corner Owners Association, Inc. (“Magnolia Corner OA”), appeals from a judgment of the Lee Circuit Court in favor of Edward Murray and Sandra Murray on a negligence claim asserted by the Murrays arising from damage caused by water intrusion to a condominium unit they own. The Murrays cross-appeal from the judgment of the trial court in favor of Magnolia Corner OA on their other claims alleging breach of contract, fraudulent concealment, and negligence and their claim seeking a declaratory judgment regarding the validity of an amendment to a condominium agreement affecting their unit.

Factual Background and Procedural History

This dispute involves a house that is a unit of Auburn’s Gameday Center at Magnolia Corner (“Magnolia Corner”), a condominium complex located in Auburn. The house was built in 1928, but it was incorporated into Magnolia Corner with the filing of a declaration of condominium (“the declaration”) in October 2000 in the Lee County Probate Court by Gameday Centers Southeastern, LLC (“GCS”), a company that owns and operates condominium complexes in various university towns in the southeast. In addition to the house, Magnolia Corner consists of a traditional, L-shaped condominium building that was constructed in 2000 and is divided into several individual units. Including the house, Magnolia Corner consists of eight total units.
The house contains a basement. An exterior, concrete staircase on the eastern side of the house provides a means of access to the basement. A drain is located in the landing of the staircase, right outside the basement door. Another drain also is positioned in the middle of the interior portion of the basement, and the *321 floor of the basement slopes toward that drain. A patio sits appurtenant to the top of the staircase. Until 2009, the patio consisted of hexagonal-shaped concrete pavers. The patio, stairs, and basement were already constructed and in existence when GCS purchased the house. The record reveals that the basement has a propensity to flood after heavy rainfall. Until 2010, the basement did not have air conditioning, although it contained fans. Testimony indicates that the basement flooded at least once while GCS owned the property-
GCS established and developed Magnolia Corner directly across the street from a separate condominium complex it owned and operated. At the time of the filing of the declaration in 2000 and for several years prior, GCS owned the house and utilized it as an office for the operation of its condominium business. Testimony indicates that the house remained in the same condition from 2000 to 2003, and that GCS made no significant alterations to the house or patio at any point during its ownership of the property. In 2003, shortly after GCS moved its operations to Atlanta, Georgia, GCS placed the house for sale. In September 2003, the Murrays entered into a contract with GCS to purchase the house in an “as is” condition. The sales contract describes the house as a “Suite” and indicates that the “nature of the rights and undertakings of the purchaser in acquiring and owning such Suite are controlled and will be subject to a Declaration of Condominium, Articles of Incorporation of the Condominium Association, Bylaws of the Association, Rules and Regulations of the Association, and a management agreement regarding the operation and management of the condominium.” The Murrays owned two units in the GCS condominium complex across the street from Magnolia Corner. Further, the record establishes that Edward Murray was a passive investor in GCS.
In December 2003, after the Murrays had entered into the contract with GCS to purchase the house but before the closing, Magnolia Corner OA filed an amendment to the declaration (“the amendment”) in the Lee County Probate Court. The amendment specified that Magnolia Corner was divided into two buildings. The amendment identified the L-shaped structure as “Building One” and the house as “Building Two.” The amendment modified section 6.01 of the declaration concerning the ownership interest each unit owner had in Magnolia Corner’s common elements, which also corresponded to each owner’s percentage share of the responsibility for the common expenses incurred by the condominium. The amendment states that the amount of ownership interest was based on the square footage of each individual unit. The amendment noted an increase in the square footage of the house from 1,350 to 1,826.50. Thus, the ownership interest in Magnolia Corner of the owner of the house increased. from 14.7% in the declaration to 19.58% in the amendment. The amendment preserved Section 5.11 of the declaration concerning the definition of a “common element,” which states, in pertinent part, as follows:
“[A]ll portions of the Condominium other than the Suites and will include the common areas and facilities located substantially as shown on the Plans and Plat. Such common areas will include the following:
“A. All of the Real Property.
“B. All improvements and parts of the Real Property which are not a Suite or Private Element.
[[Image here]]
“E. The mechanical systems and installations providing service to a Building or any Suite, such as *322 electrical power, gas, light, hot and cold water, heating and air conditioning, sanitary and storm sewer facilities and including all lines, pipes, ducts, flues, chutes, conduits, cables, wires and all other apparatus and installations in connection therewith, whether located in the Common Elements or in the Suites, except when situated entirely within a Suite for service only of that Suite.”
Section 8.01 of the declaration, which states that “[Magnolia Corner OA] is responsible for maintenance, repair, and replacement of the common elements,” was also unchanged by the amendment. Paragraph 15 of the amendment modified and designated the areas that were to be considered “limited common elements,” including, as to the house, the following:
“The walkway and steps abutting the Building Two Unit leading from the ground to the basement are Limited Common Elements appurtenant to the Building Two Unit whose use is restricted to the Building Two Unit. The maintenance, repair, upkeep and replacement of the walkway and steps abutting the Building Two Unit leading to the basement shall be the exclusive responsibility of the Owner of the Building Two Unit.”
Concerning the maintenance of the limited common elements, the amendment stated, in pertinent part, that “each Owner is responsible for the replacement, maintenance and repair of the Limited Common Elements, if any, attached to the Unit of said owner as provided for in Paragraph 15 of this Amendment.” The parties do not dispute that the patio was considered a common element of Magnolia Corner.
In January 2004, subsequent to the filing of the amendment, the Murrays closed on the purchase of the house. The Mur-rays claim that they did not receive notice of the amendment until they requested a copy of it from Magnolia Corner OA in 2007. The warranty deed executed by GCS conveying the house to the Murrays, however, referenced both the declaration and the amendment.
In 2005, following a heavy rain, the basement of the house flooded. Sandra Murray discovered approximately two to three gallons of water in the basement. Mrs. Murray stated that she witnessed the water flood the patio, flow down the steps, and brim over into the basement. Mrs. Murray testified that she removed the water using a “shop vac.” She did not notify Magnolia Corner OA of the flooding.
In May 2006, following a heavy rain, Sharon Colley, who managed the Magnolia Corner property, discovered water in the basement. She notified the Murrays of the flood. Colley contacted a vendor, Roto-Rooter, to assist in unclogging the drain located in the landing of the stairwell. A second vendor, Chem-Dry, was retained to extract the water. Chem-Dry’s invoice noted treatment for mold and mildew, but it did not contain any reference to billing for water extraction. The record indicates that Magnolia Corner OA paid the invoices submitted by both vendors. Colley testified that at a Magnolia Corner OA meeting following the flooding she received instructions not to bill the Murrays for the work performed by the vendors pending resolution of the issue concerning whose responsibility it was to pay those bills.
In 2008, Colley again discovered water in the basement following a rainstorm. As before, she notified Sandra Murray and contacted Chem-Dry and Roto-Rooter for assistance in extracting the water and unc-Iogging the stairwell drain. Testimony indicates that Chem-Dry removed 650 gal- *323 Ions of water from the basement but that there was no indication of mold or mildew present. The record reveals that Magnolia Corner OA paid the invoices submitted by the vendors. At the September 2008 Magnolia Corner OA meeting, the owners discussed the flooding of the house basement, including the theory that the rainwater flowed over the stairwell, into the landing, and then into the basement. At that meeting, the owners voted to redesign the patio outside the house to eliminate the possibility that the patio was the source of the flooding. The reconstruction of the patio did not commence until the summer of 2009.
On June 3, 2009, before the work on the patio had begun, Colley again discovered water in the basement following a heavy rainstorm. Colley notified the Murrays, and thereafter she contacted Chem-Dry to extract the water. Chem-Dry removed 360 gallons of water. Colley also contacted Roto-Rooter, who discovered that the drain in the landing of the staircase had been clogged. Colley testified that, after Chem-Dry completed its work, the basement floor was dry. On August 2, 2009, the Murrays visited the house for the first time since the June 3 flood. They discovered that boxes in the basement were still damp, and they noticed a mold and mildew problem. Dr. Willard Blevins of Suncrest Laboratories inspected the interior of the house for mold. Dr. Blevins testified at trial that mold grows at levels of elevated humidity. He indicated that the basement had no air conditioner and no vent allowing conditioned air from the upstairs to flow in. He also stated that the basement had one dehumidifier that may not have been running. Dr. Blevins testified that the existing conditions inside the basement remained conducive to mold amplification and that he had recommended improved humidity control throughout the entire house. Dr. Blevins’s report noted that the window well on the front of the house had a mold problem because it was not sealed or caulked properly. ServPro, a vendor, performed mold remediation, and it invoiced the Murrays for the work. Dr. Blevins sent his invoice to Colley, who in turn sent it to the Murrays. Remediation required the basement to be emptied, the walls to be torn down to the studs, and linoleum to be removed at a cost of $8,573.93. At the September 2009 meeting of Magnolia Corner OA, the condominium unit owners discussed the ServPro invoice. The record indicates that Colley insisted to ServPro and to Dr. Blevins that she had no authority to give them permission to do the work and that she instructed them to contact the Murrays.
In the summer of 2009, the common patio area outside the house was reconstructed at the expense of Magnolia Corner OA. The hexagonal pavers were removed and a solid concrete pour was installed with all four sides sloped to a drain. The drain consisted of a one-foot catch basin with a drain pipe that directed water to the street.
The reconstruction work did not eliminate the flooding problems. In the fall 2009, more water entered the basement after a heavy rain. On August 25, 2011, Sandra Murray discovered water in the basement following a rainstorm. The water had pooled around the basement drain to a size of about a hulahoop. In September 2011, Tropical Storm Lee passed over Auburn. Charlie Stringfellow, the president of Magnolia Corner OA, inspected the patio and basement while it was still raining and found that the patio and the stairs were dry. Stringfellow testified that water pooled in one corner of the landing of the stairwell as if the water was seeping through the wall on the left side of the stairwell. Colley contacted Roto-Rooter. The Roto-Rooter technician removed a *324 plug from the interior basement drain, and the water immediately drained out of the basement. The technician testified at trial that the basement drain pipe had not been clogged. He testified that he had discovered that water was coming into the basement through the wall of the basement closest to Magnolia Avenue, not through the door of the basement leading from the stairwell landing into the basement.
James Smith, a general contractor who has worked in the grading industry for 27 years, testified that he had inspected the house and the patio roughly three weeks before trial. He stated that the drainage box installed in the patio is not large enough to handle the rainwater that collects on the patio and that the water is diverted toward the house due to the slope of the patio.
Magnolia Corner OA received $65,000 from the City of Auburn for condemnation of a portion of the condominium property as a result of the widening and improvement of the roads adjacent to the property. Section 6.07 of the declaration requires that all surplus funds held by Magnolia Corner OA are to be distributed to unit owners according to their assessment percentage. Section 6.07 states as follows:
“6.07 Disposition of Surplus.
“Each Suite shall carry with it a proportionate share of Common Surplus, as the case may be, and the proportionate share of Common Surplus shall be the same ratio as that Owners’ percentage ownership of the Common Elements; or in the alternative, such surplus or any portion thereof may be added to a reserve fund for maintenance, repair, and replacement of the Common Elements, at the sole discretion of the Association.”
At the September 18, 2009, Magnolia Corner OA meeting, the owners voted to place the condemnation funds in reserve for future expenses.
On February 23, 2010, the Murrays sued Magnolia Corner OA in the Lee Circuit Court. The Murrays’ complaint contained counts alleging (1) negligence and gross negligence relating to the water intrusion into the basement; (2) trespass based on the water flow from the patio, down the stairs, and into the basement; (3) strict liability for the water damage; (4) negligence relating to nondisclosure of the existence of the amendment; (5) fraudulent concealment of the amendment; and (6) breach of contract for failing to distribute the surplus funds; the Murrays’ complaint also included a count seeking a declaratory judgment as to the validity of the amendment. Before trial, the Murrays abandoned their strict-liability claim. The trial court held a nonjury trial on the remaining claims on October 10, 2011, and October 19, 2011. On December 30, 2011, the trial court entered a judgment in favor of the Murrays and against Magnolia Corner OA in the amount of $20,728.67 for negligence relating to the water intrusion into the basement. The trial court also initially found in favor of the Murrays in part on their declaratory-judgment claim relating to the disbursement of the $65,000 held in reserve and ordered that the funds be distributed according to the assessment percentages set forth in the amendment. The court found for Magnolia Corner OA on the claims of trespass, negligence relating to nondisclosure of the amendment, fraudulent concealment, and breach of contract. The court further found that the amendment was not void. On January 27, 2012, Magnolia Corner OA filed a motion to alter, amend, or vacate. On April 25, 2012, the trial court vacated a portion of the judgment on the declaratory-judgment claim concerning the distribution of the $65,000 surplus funds to state that Magnolia Corner OA shall distribute and/or hold *325 in reserve the surplus “as was determined by vote taken at the September 18, 2009 annual meeting of [Magnolia Corner OA].” Both Magnolia Corner OA and the Mur-rays filed a timely notice of appeal to this court.

Standard of Review

“ ‘ “When ore tenus evidence is presented, a presumption of correctness exists as to the trial court’s findings on issues of fact; its judgment based on these findings of fact will not be disturbed unless it is clearly erroneous, without supporting evidence, manifestly unjust, or against the great weight of the evidence. J & M Bail Bonding Co. v. Hayes, 748 So.2d 198 (Ala.1999); Gaston v. Ames, 514 So.2d 877 (Ala.1987). When the trial court in a nonjury case enters a judgment without making specific findings of fact, the appellate court ‘will assume that the trial judge made those findings necessary to support the judgment.’ Transamerica Commercial Fin. Corp. v. AmSouth Bank, 608 So.2d 375, 378 (Ala.1992). Moreover, ‘[u]nder the ore tenus rule, the trial court’s judgment and all implicit findings necessary to support it carry a presumption of correctness.’ Transamerica, 608 So.2d at 378. However, when the trial court improperly applies the law to [the] facts, no presumption of correctness exists as to the trial court’s judgment. Allstate Ins. Co. v. Skelton, 675 So.2d 377 (Ala.1996); Marvin’s, Inc. v. Robertson, 608 So.2d 391 (Ala.1992); Gaston, 514 So.2d at 878; Smith v. Style Advertising, Inc., 470 So.2d 1194 (Ala.1985); League v. McDonald, 355 So.2d 695 (Ala.1978). ‘Questions of law are not subject to the ore tenus standard of review.’ Reed v. Board of Trustees for Alabama State Univ., 778 So.2d 791, 793 n. 2 (Ala.2000). A trial court’s conclusions on legal issues carry no presumption of correctness on appeal. Ex parte Cash, 624 So.2d 576, 577 (Ala.1993). This court reviews the application of law to facts de novo. Allstate, 675 So.2d at 379 (‘[Wjhere the facts before the trial court are essentially undisputed and the controversy involves questions of law for the court to consider, the [trial] court’s judgment carries no presumption of correctness.’).” ’
“[Farmers Ins. Co. v. Price-Williams Assocs., Inc.,] 873 So.2d [252,] 254-55 [ (Ala.Civ.App.2003) ] (quoting City of Prattville v. Post, 831 So.2d 622, 627-28 (Ala.Civ.App.2002)).”
Kellis v. Estate of Schnatz, 983 So.2d 408, 412 (Ala.Civ.App.2007).

Discussion

I. Magnolia Comer OA’s Appeal — Negligence, Contributory Negligence, and Mitigation of Damages Relating to the Water-Intrusion Issue
“ ‘To establish negligence, the plaintiff must prove: (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury.’” Martin v. Hodges Chapel, LLC, 89 So.3d 756, 762-763 (Ala.Civ.App.2011) (quoting Martin v. Arnold, 643 So.2d 564, 567 (Ala.1994), citing in turn Albert v. Hsu, 602 So.2d 895, 897 (Ala.1992)).
On appeal, Magnolia Corner OA fist contends that, in finding that it was liable to the Murrays for the intrusion of the water into the Murrays’ basement, the trial court incorrectly determined the legal duty that it owed to the Murrays. Magnolia Corner OA asserts that its only legal duty was to refrain from channeling rainwater runoff onto the Murrays’ property. In support of this argument, Magnolia Corner OA cites eases holding that an *326 action for damages resulting from surface-water flow is sustainable only when an upper landowner has channeled water onto the property of a lower landowner. In Easterling v. Awtrey Building Corp., 770 So.2d 606 (Ala.Civ.App.1999), this court held:
“Since it decided W.T. Ratliff[ Co. v. Henley, 405 So.2d 141 (Ala.1981) ], which involved the deposit of sand and gravel upon adjacent land, the Alabama Supreme Court has held that the channeling of surface water onto a lower proprietor’s land will support an indirect trespass cause of action against the party responsible for the channeling. In Johnson v. Washington, 474 So.2d 651 (Ala.1985), the plaintiffs alleged that after the defendant had developed his adjoining property, they had begun to experience flooding and damage to their home, along with surface-water runoff and red dirt coming onto their land. On appeal from an adverse judgment, the defendant contended that the trial court erred in instructing the jury on the law of indirect trespass as stated in W.T. Ratliff. However, the Supreme Court concluded that the trial court’s instruction concerning indirect trespass was not erroneous, noting that ‘the evidence indicates that surface water, red dirt, sand, and other debris entered onto the plaintiffs’ land.’ 474 So.2d at 653 (emphasis added). Johnson thus recognizes that the deposit of surface water and debris upon land as a result of the change of the natural topography of adjacent land will give rise to an indirect-trespass claim against the owner of the adjoining land. See also Fisher v. Space of Pensacola, Inc., 483 So.2d 392, 395 (Ala.1986) (stating that a trespass action can be maintained in a proper case involving direct diversion of surface water, but declining to apply rule because the plaintiffs trespass claim was voluntarily dismissed before trial).”
770 So.2d at 609-610. We note that East-erling and the cases cited therein involved trespass rather than negligence claims; moreover, this case is distinguishable from the standard water-runoff cases because Magnolia Corner is a common-interest community. The responsibilities and duties of Magnolia Corner OA are set forth in the declaration and the amendment. The declaration and the amendment make it clear that Magnolia Corner is governed pursuant to the Alabama Uniform Condominium Act of 1991 (“the Act”) codified at Ala.Code 1975, § 35-8A-101 et seq. Based on the facts of this case, Magnolia Corner OA owed a duty, both under the Act and under the declaration, to maintain the common elements, including the patio, to prevent surface water from damaging the unit owners’ property. Section 35-8A-307(a), Ala.Code 1975, states:
“Except to the extent provided by the declaration, subsection (b), or section 35-8A-313(h), [AIa.Code 1975,] the association is responsible for maintenance, repair, and replacement of the common elements, and each unit owner is responsible for maintenance, repair, and replacement of his unit. Each unit owner shall afford to the association and the other unit owners, and to their agents or employees, access through his unit reasonably necessary for those purposes. If damage is inflicted on the common elements, or on any unit through which access is taken, the unit owner responsible for the damage, or the association if it is responsible, is liable for the prompt repair thereof.”
The declaration and the amendment do not invalidate or alter this duty. Section 8.01 of the declaration, in fact, reaffirms Magnolia Corner OA’s duty to maintain the common elements. Section 8.01 states *327 that “[t]he association is responsible for maintenance and repair, and replacements of the common elements.” Further, Section 5.11 of the declaration suggests that Magnolia Corner OA also has the duty to maintain the drain at the bottom of the stairwell, because “the mechanical systems and installations providing service to a Building or any Suite, such as ... sanitary and storm sewer facilities and including all lines, pipes, ducts.... ” are considered common elements. Thus, pursuant to the Act and the declaration, Magnolia Corner OA owed a duty to maintain the patio as a common element to prevent water from flowing from the patio onto the Murrays’ property.
Magnolia Corner OA next asserts that the trial court erred by finding that the evidence supported a judgment against it for negligence relating to water intrusion. Specifically, Magnolia Corner OA contends that the source of the flooding of the basement is a disputed fact and that there is little evidence to support a finding that the patio was the source of the flooding. In its judgment, the trial court did not make any findings of fact. We must assume that the trial judge made those findings necessary to support the judgment. Transamerica, 608 So.2d at 378. The record reveals sufficient evidence from which the trial court could have properly determined that the patio was the source of the flooding. Sandra Murray testified that she witnessed water flowing down the stairwell during a heavy rain in 2005. She further testified that “water tracks” were present on the stairs after the heavy rains that precipitated the flooding in the basement. Also, Magnolia Corner OA undertook action to reconstruct the patio to eliminate the patio as a source of the flooding. Although the flooding continued after the reconstruction of the patio, the trial court could have reasonably been convinced by the testimony of the Murrays’ expert witness that the reconstructed patio continued to direct water toward the stairwell and that the newly installed drain was not large enough to catch the water flow during heavy rains. Although Magnolia Corner OA presented testimony concerning other possible sources of the flooding, the trial court was in the unique position to directly observe the witnesses and to assess their demeanor and credibility. See Ex parte Fann, 810 So.2d 631, 633 (Ala.2001). There is sufficient evidence in the record to support the trial court’s finding of negligence relating to the water intrusion.
Magnolia Corner OA next asserts that the trial court erred in not finding the Murrays to be contributorily negligent by failing to properly maintain the stairwell drain and the basement drain.
“It has been said a number of times that the three elements essential to contributory negligence are that the party charged with contributory negligence (1) had knowledge of the condition or failure (2) appreciated the danger and (3) failed to exercise reasonable care in the premises, but with such knowledge and appreciation, put himself into the way of danger. Baptist Medical Center v. Byars, 289 Ala. 713, 271 So.2d 847 [(1972)]; Kingsberry Homes Corp. v. Ralston, 285 Ala. 600, 235 So.2d 371 [(1970)]; F.W. Woolworth Company v. Bradbury, 273 Ala. 392, 140 So.2d 824 [(1962)]; Foster & Creighton Co. v. St. Paul Mercury Indemnity Co., 264 Ala. 581, 88 So.2d 825 [(1956)]; Mackintosh Co. v. Wells, 218 Ala. 260, 118 So. 276 [(1928)].
“Some of the cases cited supra involved assumption of risk. In others, there was a special duty of care imposed upon the owner of the premises. However, it has long been recognized that contributory negligence may also be *328 predicated upon the failure to appreciate the danger when there is a reasonable opportunity to do so under the circumstances.”
Alabama Power Co. v. Mosley, 294 Ala. 394, 398, 318 So.2d 260, 263 (1975). Magnolia Corner OA contends that the Mur-rays appreciated or should have appreciated the danger in not maintaining the drain at the bottom of the stairwell outside their basement door and in not unplugging the drain in the middle of the basement floor. As stated, supra, paragraph E. of § 5.11 of the declaration includes the following within the definition of common elements:
“The mechanical systems and installations providing service to a Building, or to any Suite, such as electrical power, gas, light, hot and cold water, heating and air conditioning, sanitary and storm sewer facilities, and including all lines pipes, ducts, flues, chutes, conduits, cables, wires and all other apparatus and installations in connection therewith, whether located in the Common Elements or in the Suites, except when situated entirely within a Suite for service only of that Suite.”
Pursuant to paragraph 15 of the amendment, the stairs are considered a limited common element “whose use is restricted to the Building Two Unit.” The fact that the stairs are a limited common element under the amendment does not negate the fact that the drain at the bottom of the stairwell is classified as a common element pursuant to § 5.11 of the declaration. Magnolia Corner OA had knowledge of both the clogging of the stairwell drain and the improper draining of the patio before the June 2009 rain event. Under the declaration and the amendment, the Murrays had no duty to maintain the drain in the stairwell. Concerning the interior basement drain, the trial court could have concluded that the fact that it was plugged was irrelevant because, it could have properly concluded, had this drain been operational, water still would have entered the basement and damaged the property. The issue of the Murrays’ contributory negligence was a disputed issue of fact, and therefore the ore tenus rule applies. Sufficient evidence exists in the record to support the trial court’s determination that the Murrays were not contributorily negligent. We will not disturb this finding on appeal.
Magnolia Corner OA further argues that the Murrays failed to mitigate their damages.
“[T]he law imposes upon all parties who seek recompense from another a duty to mitigate their losses or damages. Aetna Life Insurance Co. v. Lavoie, 470 So.2d 1060 (Ala.1984). It is equally well established that a plaintiff can recover only for that damage or loss that would have been sustained if the plaintiff had exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate the damage or loss (Equilease Corp. v. McKinney, 52 Ala.App. 109, 289 So.2d 809 (1974)); and whether the plaintiff has sufficiently mitigated the damages, generally speaking, is a question of fact. Carnival Cruise Lines, Inc. v. Goodin, 535 So.2d 98 (Ala.1988).
“Stated otherwise, the injured or damaged party is legally bound to lessen the recoverable damages so far as is practicable by the use of ordinary care and diligence. Thus, the rule of mitigation requires a party suffering injury, damage, or loss to take reasonable steps to reduce it.
“The rule of mitigation finds its application only in the context of evidence from which the factfinder may reasonably infer that the claimant rejected a reasonable course of action that an ordi *329 narily prudent person would have taken under similar circumstances to minimize the injury, damage, or loss. In other words, the party seeking to invoke the rule must meet a threshold ‘sufficiency of the evidence’ test, lest the issue be resolved against the movant as a matter of law. The rule does not apply where the injured party, in an effort to minimize the loss, would be required to incur considerable personal risk or expense with but a slight chance of an alternative recovery. Id.”
Avco Fin. Servs., Inc. v. Ramsey, 631 So.2d 940, 942-43 (Ala.1994). The trial court made no findings of fact on the issue of mitigation of damages. Magnolia Corner OA contends that, after the June 2009 flood, the Murrays failed to come to Auburn in a reasonably timely fashion to inspect the house. Magnolia Corner OA argues that, because the Murrays did not come to inspect the house until August and did not send someone else to inspect the house earlier, mold and mildew accumulated in the house. Based on the evidence, we find this argument to be unpersuasive. The trial court had before it the following e-mail, which was sent by Stringfellow to the Murrays on June 7, 2009:
“Subsequently, we need to address the issue of the flooding you have just experienced. This requires further assessment and evaluation of the entire issue and will require the Involvement of all home owners.
[[Image here]]
“After talking with Sharon [Colley], we will keep you posted on what is being done. The most urgent is getting water pumped out of your house and things dried out which Sharon may already have under control. Then the priority is to get the patio reconstructed. We, as well as Sharon, will keep you posted.”
The trial court could have determined that the Murrays reasonably relied on Magnolia Corner OA and its representatives to handle the water extraction. Further, the trial court heard testimony from Sandra Murray indicating that the Murrays were unable to visit the house immediately after the flood^because they were busy rebuilding their primary residence that had been destroyed by a tornado in another county.
The negligence count related to water intrusion Was submitted to the trial court for a resolution based on disputed facts. Based on the evidence presented, there was sufficient evidence to support the trial court’s determinations that Magnolia Corner OA breached a duty owed to the Mur-rays, and that the Murrays neither were eontributorily negligent nor failed to mitigate their damage. Therefore, we affirm the trial court’s judgment on the count of negligence relating to the issue of the water intrusion.
II. The Murray’s Cross-Appeal
A. Negligence and Fraudulent Concealment Relating to the Amendment
The Murrays contend on cross-appeal that Magnolia Corner OA was obligated to disclose the existence of the amendment to the Murrays at the time they purchased the house and that Magnolia Corner OA fraudulently concealed the amendment from the Murrays and negligently failed to disclose the existence of the amendment:
“To establish a prima facie case of fraudulent concealment of a material fact, a plaintiff must show (1) that the defendant had a duty to disclose a material fact, (2) that the defendant concealed or failed to disclose a material fact, (3) that the defendant’s concealment or failure to disclose the material fact induced the plaintiff to act or to refrain from acting, and (4) that the *330 plaintiff suffered actual damage as a proximate result. Soniat v. Johnson-Rast & Hays, 626 So.2d 1256 (Ala.1993); see Cornelius v. Austin, 542 So.2d 1220, 1223 (Ala.1989).
“Mere silence is not fraudulent in the absence of a duty to disclose. A duty to disclose may arise from the particular circumstances of the case, from a confidential relationship, or from a request for information. Hardy v. Blue Cross & Blue Shield of Alabama, 585 So.2d 29, 32 (Ala.1991); King v. National Foundation Life Ins. Co., 541 So.2d 502 (Ala.1989). One may also recover for fraudulent concealment by showing active concealment of a material fact with an intent to deceive or mislead. § 6-5-103, Alabama Code 1975; Soniat v. Johnson-Rast & Hays; Cornelius v. Austin; Harrell v. Dodson, 398 So.2d 272, 276 (Ala.1981).”
Dodd v. Nelda Stephenson Chevrolet, Inc., 626 So.2d 1288, 1293-94 (Ala.1993).
“The question whether a party had a duty to disclose is a question of law to be determined by the trial court.” Barnett v. Funding Plus of America, Inc., 740 So.2d 1069, 1074 (Ala.1999). Our supreme court has established the factors the trial court must consider and apply in determining whether a duty to disclose exists: “(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiffs’ opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances.” State Farm, Fire & Casualty Co. v. Owen, 729 So.2d 834, 842—13 (Ala.1998); see also Armstrong Bus. Servs., Inc. v. AmSouth Bank, 817 So.2d 665 (Ala.2001).
“A duty to communicate can arise from a confidential relationship between the plaintiff and the defendant, from the particular circumstances of the case, or from a request for information, but mere silence in the absence of duty to disclose is not fraudulent....
[[Image here]]
“This Court has stated that whether one has a duty to speak depends upon a fiduciary, or other, relationship of the parties, the value of the particular fact, the relative knowledge of the parties, and other circumstances of the case.... When the parties to a transaction deal with each other at arm’s length, with no confidential relationship, no obligation to disclose information arises when the information is not requested.”
Mason v. Chrysler Corp., 653 So.2d 951, 954-55 (Ala.1995).
The Murrays assert that, although it was not a party to the contract for the sale of the house, Magnolia Corner OA had an obligation to communicate the existence of the amendment, a material fact, to the Murrays. The Murrays cite Miller v. Miller’s Landing, L.L.C., 29 So.3d 228 (Ala.Civ.App.2009), in support of this contention. In that case, this court stated that a common-interest community has a duty “ to act reasonably in the exercise of its discretionary powers, including rule-making, enforcement, and design-control powers.’ The duty to act reasonably also applies to the power to amend the declaration, or governing documents, of a common-interest community.” 29 So.3d at 236 (quoting § 6.13 and citing § 6.10 (Comment f) Restatement (Third) of Property: Servitudes (2000)). We note that, until the sale of the house was final, the Murrays were not members of Magnolia Corner OA. Thus, we find Miller to be inapplicable to this case.
We conclude that, based on the evidence before it, the trial court could have correctly determined that, under the circumstances of this case, Magnolia Cor *331 ner OA did not have a duty to disclose the existence of the amendment. First, Magnolia Corner OA did not participate in the sale of the house to the Murrays; rather, GCS, the developer of the property, sold the house directly to the Murrays. See Gaulden v. Mitchell, 849 So.2d 192 (Ala. Civ.App.2002) (noting that the party failing to disclose information was not the seller). Second, the sales agreement entered into between GCS and the Murrays refers to the declaration, and the general warranty deed executed by GCS specifically references the existence of the amendment and includes information concerning the precise location of the amendment within the probate court records. The Murrays were placed on notice of the existence of the publicly recorded declaration and amendment. Further, the Murrays were familiar with and had experience in the workings of condominiums; the record establishes that the Murrays owned two units of another condominium complex in Auburn and that Edward Murray was a passive investor in GCS, a condominium business. We cannot, based on the facts of this case, hold that the judgment in favor of Magnolia Corner OA on the Murrays’ negligence and fraudulent-concealment claims relating to the existence of the amendment was erroneous.
B. Declaratory Judgment Concerning the Amendment
The Murrays contend on cross-appeal that the trial court erred by failing to find that the amendment was void ab initio. In this portion of their cross-appeal, the Mur-rays argue that the amendment is invalid because it imposes upon them, as owners of Building Two, an assessment for the cost of exterior repairs to Building One. Section 35-8A-315(c)(2), Ala.Code 1975, states, in pertinent part, as follows:
“(c) To the extent required by the declaration:
[[Image here]]
“(2) Any common expense or portion thereof benefiting fewer than all of the units must be assessed exclusively against the units benefited.”
Per the amendment, the Murrays’ portion of assessments for common expenses is 19.58%. The Murrays contend that they did not benefit from the repairs to Building One and, thus, should not be ordered to pay a share of that assessment. The Murrays further assert that they are due reimbursement from Magnolia Corner OA for any assessment they may have paid where only the owners in Building One were benefited.
Section 35-8A-217(b), Ala.Code 1975, establishes a time limitation on a challenge to the validity of an amendment to a declaration of condominium. That section states that “[n]o action to challenge the validity of an amendment adopted by the association pursuant to this section may be brought more than one year after the amendment is recorded.” The record reveals that the amendment was recorded in the Lee County Probate Court in December 2003. The Murrays filed this action over six years later, in February 2010, well beyond the one-year limitation period. The Murrays contend that because Magnolia Corner OA fraudulently concealed the existence of the amendment from the Mur-rays, the one-year statutory period should be tolled pursuant to § 6-2-3, Ala.Code 1975. That statute states:
“In actions seeking relief on the ground of fraud where the statute has created a bar, the claim must not be considered as having accrued until the discovery by the aggrieved party of the fact constituting the fraud, after which he must have two years within which to prosecute his action.”
*332 As discussed, supra, we hold that Magnolia Corner OA did not fraudulently conceal the existence of the amendment. Thus, we hold that the Murrays’ challenge to the amendment is time-barred, and we affirm the trial court’s determination that the amendment is valid.
C. Weight of Voting & Breach of the Declaration
The Murrays raise two additional arguments in their cross-appeal. They contend (1) that the trial court erred in failing to find that the vote of each unit owner is to be weighted according to the assessment percentage of each individual unit and (2) that the trial court erred in failing to find that Magnolia Corner OA breached the declaration by failing to distribute surplus funds it held. The Mur-rays, however, have failed to cite any authority to substantiate these arguments on appeal to support their claims, including their claim for breach of contract. This precludes our consideration of the arguments. It is well settled that “[t]his court will address only those issues properly presented and for which supporting authority has been cited.” Asam v. Devereaux, 686 So.2d 1222, 1224 (Ala.Civ.App.1996).
“Rule 28(a)(10)[, Ala. R.App. P.,] requires that arguments in briefs contain discussions of facts and relevant legal authorities that support the party’s position. If they do not, the arguments are waived. Moore v. Prudential Residential Servs. Ltd. P’ship, 849 So.2d 914, 923 (Ala.2002); Arrington v. Mathis, 929 So.2d 468, 470 n. 2 (Ala.Civ.App.2005); Hamm v. State, 913 So.2d 460, 486 (Ala.Crim.App.2002). ‘This is so, because “ ‘it is not the function of this Court to do a party’s legal research or to make and address legal arguments for a party based on undelineated general propositions not supported by sufficient authority or argument.’ ” ’ Jimmy Day Plumbing & Heating, Inc. v. Smith, 964 So.2d 1, 9 (Ala.2007) (quoting Butler v. Town of Argo, 871 So.2d 1, 20 (Ala.2003), quoting in turn Dykes v. Lane Trucking, Inc., 652 So.2d 248, 251 (Ala.1994)).”
White Sands Group, L.L.C. v. PRS II, LLC, 998 So.2d 1042, 1058 (Ala.2008). Thus, we affirm the trial court’s judgment on these matters.

Conclusion

For the reasons set forth above, the judgment of the trial court is due to be affirmed.
APPEAL — AFFIRMED.
CROSS-APPEAL — AFFIRMED
THOMPSON, P.J., and PITTMAN, THOMAS, and MOORE, JJ., concur.